16408

BRYAN *ET AL.* v. BRYAN

(61 S. E. (2d) 177)

*Messrs. Lee & Shuler* and *Edward W. Cantwell,* of Kingstree, and *Henry E. Davis,* of Florence, *for Appellant,*

*Messrs. Connor & Connor,* of Kingstree, *for Respondents,*

September 12, 1950.

FISHBURNE, Justice.

The respondent, Elizabeth J. Bryan, owns two tracts of land in Williamsburg County: one known as her home tract where she resides, containing 247 acres; and the other tract, known as the "Martha" Place, containing sixty-two and one-half acres. The larger tract of land is located to the north of South Carolina State Highway 521, and is separated therefrom by a portion of appellant's land. An avenue leads from the highway across the lands of appellant to the dwelling house of respondents. The "Martha" tract is located on the south side of the same highway, and it likewise is separated from the highway by a portion of appellant's land. As in the case of the larger tract, an avenue or roadway leads from the highway across appellant's land to the dwelling on the Martha tract.

Appurtenant to the two tracts of land, Mrs. Bryan possessed an easement,—and admitted right,—to the use of these avenues or roads leading across appellant's lands for ingress and egress for herself, her tenants and sharecroppers. In fact, the record shows that the public used these roads without let or hindrance, and had been doing so for more than twenty years.

The respondents, Vivian B. Lifrage, is the daughter, and Harry O. Lifrage is the son-in-law of the other respondent,

Elizabeth J. Bryan. The appellant, J. G. Bryan, is the brother-in-law of the respondent, Mrs. Bryan, and the uncle of the respondent, Vivian B. Lifrage.

The parties to the action have owned their respective lands for many years, and have farmed it by tenants and sharecroppers. In 1945, 1946, and 1947, Harry O. Lifrage and Vivian B. Lifrage rented the farming lands on the two tracts from Mrs. Bryan for an annual rental of $400.00, and lived in the home with Mrs. Bryan, the respondent. In the cultivation of the crops, they utilized colored tenants and sharecroppers, as did the appellant on his adjoining farm.

Respondents allege that during the winter of 1947-1948, their tenants and sharecroppers moved from their premises; and they charge that this resulted from threats of violence on the part of appellant. That appellant, with the willful and malicious intent to injure respondents, forbade them and their tenants and sharecroppers from using the avenues or roads in question which crossed his land, and threatened them with violence and injury if found upon the roads. It is also charged that appellant circulated rumors among the Negroes in the vicinity as to what he would do with any one of them if as a tenant or sharecropper of respondents, he traveled these roads.

It is further alleged that as a direct consequence of threats of injury and personal violence, the Negro tenants and sharecroppers became intimidated, left the respondents' farms, and that by reason of such threats, respondents were unable to obtain other tenants or sharecroppers. The Lifrage respondents were forced to abandon their farming operations for the succeeding year,—that is, 1948,—and rented the lands for agricultural purposes to Mr. Boyd, a nearby farmer, for the same rental they were paying Mrs. Bryan, to wit: the sum of $400.00. The record shows that Boyd transported his laborers daily by truck back and forth from his farm to the Bryan place.

Appellant admitted by answer that respondents had the right to use the roads across his lands to their respective farms, but he denied the threats of violence, and denied that anything he did resulted in damage to them.

The trial resulted in a verdict for respondents in the sum of $3,000.00, actual damages, and $2,000.00, punitive damages, after which a motion for a new trial was made before the trial judge, and denied.

■ Error is assigned by appellant because the court allowed the witness, Fred Holmes, who was a tenant of respondent in 1947, to testify concerning rumors and messages which he claims to have heard.

Holmes had been a sharecropper of respondents continuously for more than twenty years. He testified that during that period he lived in a tenant house on the home tract. He said that in the latter part of 1947 a message was brought to him by his uncle, Andrew Tisdale, concerning the use of the roads leading from Mrs. Bryan's place to the highway and across lands of appellant. He said that until he received this message, he had intended to continue as a sharecropper on respondent's home tract, but being fearful of what Mr. Bryan might do to him if he used the road, which was the only means of ingress and egress, he felt forced to leave and did leave.

The court held that this witness, Holmes, could testify to what he did or did not do as a result of the rumors referred to, and whether as a result he became afraid. This challenged testimony was later connected up, without objection of appellant, with the evidence given by Andrew Tisdale. Tisdale said that appellant told him to give Fred Holmes a message, —that if he caught him on his place he was going to "leave him right there." This message was given by Tisdale to Holmes and appellant admitted while on the stand, that he sent the message in question to Holmes by Tisdale. It is true that he denied giving any specific orders not to use the roads, but he admitted that the message contained the specific

injunction, "not to go on my land." Throughout the case, appellant attempted to make a distinction between his lands and these roads which crossed them, just as though respondents, their sharecroppers and tenants were trespassers on his land adjacent to the roads. But the testimony of many witnesses was clear on the point that in making his threats of violence, he had reference not only to the lands, but to the *roads*.

We think no error was committed in the introduction of this evidence.

■ I. M. Boyd, who rented respondent's farming lands for the year 1948, testified as to the amount of cotton crops made and sold by him from these lands during that year. 'Appellant argues that the admission of this evidence constituted error, as it comprised no index as to what respondents would have made in the year 1948.

The record shows that counsel for respondents sought to elicit this testimony on direct examination of Mr. Boyd. On objection interposed by appellant's counsel, the testimony was excluded. Upon cross examination, however, substantially the same facts were brought out by appellant's counsel. When this occurred, the court permitted counsel for respondents to pursue the same line of examination. Assuming without deciding that the evidence was inadmissible, appellant is not in a position to raise the issue. Under the circumstances stated, the court committed no error.

■ Mr. Boyd testified that he sold from his crops made on respondent's lands $4,800.00 worth of tobacco; that in addition to this he made twenty-three bales of cotton, and four or five hundred bushels of corn. Assuming, as did the trial judge, that the cotton was of standard size bales and in 1948 was of the value of thirty cents per pound, the crops,—cotton and tobacco,—would have amounted to $8,250.00. The evidence shows that in the previous year, 1947, respondents made over $7,000.00 in share crops on the farm, and that their share of this income would have amounted to $3,530.98.

In our opinion, this testimony was not too speculative upon which to assist the jury in reaching a verdict for actual damages. The exception raising this issue is overruled.

We next consider whether the trial judge erred in permitting counsel for respondents to cross-examine appellant as to the ill will he entertained against respondents.

Appellant admits that broad latitude is allowed in the cross-examination of witnesses, but argues that the challenged testimony went beyond legitimate bounds. The complaint, however, charges that appellant was actuated in making his threats with reference to the use of the roads in question, by malice and ill will. To sustain this allegation it was necessary for respondents to prove a willful and malicious intent and to show appellant's state of mind.

The record is replete with evidence showing the malicious attitude of appellant toward respondents, and his determined intent to injure them. On his cross-examination, objected to, he stated that he met respondent, Lifrage, who appealed to him to settle their past differences in a friendly manner. Appellant stated that this overture indicated a Christian attitude, but regardless of this, he refused to discuss the matter with Lifrage because, as he stated, he preferred to hold his grudge against him. He testified that they had had friction because respondent, Lifrage, had taken up appellant's trespassing hogs and made him pay damages; and that he thought respondent had caused him and his brother to fall out over the division of some property.

To throw further light on this question, respondent's niece, Mrs. Lifrage, testified that after their tenants had left respondents' farming lands and prospective sharecroppers had refused to enter thereon because of threats of violence made against them by appellant, she went to appellant's home to discuss the matter with him and to learn from him if he had made the threats. And in reply to her questions, he said: "I told them (tenants and prospective sharecroppers),

I didn't expect for them to use this road, or put a foot on my land. And I asked him, why do you do this to me, and he said, I don't expect you to have any tenants in your houses and I don't expect you to farm  *  *  *;  and he said, not only the colored people, but I don't want you to put your foot on the roads going in and out either."

In our opinion, the cross-examination of appellant as to the deep seated differences between him and respondents in order to show his state of mind and motive did not exceed proper limits.

It is next contended that the trial court erred in allowing counsel for respondents to cross-examine appellant as to the manner in which he obtained title to his lands. After testifying on cross-examination and explaining in more or less detail why he held a grudge and entertained ill will against the respondent, Lifrage, appellant testified that the respondent caused him and his brother to fall out over some property. We have referred to this part of his testimony in the forepart of this opinion. He was then asked: "Q. You got all of your father's property? A. No. Q. Did Mrs. Lifrage's father get any of it?" At this point appellant's counsel objected on the ground that the cross examination was going too far. The objection was sustained, and no further reference was made to any division of the family property. We are unable to see any basis, in view of the trial judge's ruling, for the alleged error. This exception is overruled.

Nor in our opinion did the trial judge commit error in refusing to direct a verdict in favor of appellant as to punitive damages. We agree with the trial court that there is abundant evidence in the record to sustain the verdict of punitive damages, if the jury believed the testimony of plaintiff's witnesses. Not only did the tenants and sharecroppers who were engaged in farming operations for respondents in 1947 move off respondents' lands because of appellant's threats, but for the same reason prospective sharecroppers breached their agreements and refused to use

the roads which crossed appellant's lands to the farm of respondents.

It appears that Robert McCray entered into an agreement with Mr. Lifrage to live on his land and become a sharecropper for the year 1948, but he breached the contract because of a conversation he had with appellant. He stated that he had heard of the threats made by appellant, went to see him, and asked him if he would allow anyone to go across his place to respondents' farm. Appellant told him, "I don't mind you moving with Mr. Lifrage, but I don't want you to cross my land, and if you put one foot on it, I am going to kill you." He was asked, "Did he (appellant) tell you the only way for you to get into the place was to cross his land?" And witness answered, "The road leading into the Lifrage land," and that he "owned that road."

It is unnecessary to discuss this testimony in detail. Other witnesses testified substantially to the same thing. All of it tended to show willfullness, wantonness and malice.

The trial judge in our opinion committed no error in refusing to set aside the verdict and grant a new trial on the whole case. All of these grounds which were presented to the trial court as a basis for a new trial have been discussed except two. It is argued that the verdict of the jury is excessive. We are in accord with the trial court in its holding, that the verdict for actual damages is not excessive. The respondents have been deprived of the use of their property in the operation of it as a farm by tenants and sharecroppers, which, the testimony shows, had been very profitable. Due to appellant's conduct, they were unable to get Negro tenants or sharecroppers to enter the place; in fact, the continuity of a successful and established business had been disrupted.

Nor do we think that the trial judge committed an abuse of discretion in holding that the verdict for punitive damages was not excessive.

Finally, it is contended that the circuit court committed error in refusing to grant a new trial based upon the improper argument of respondent's counsel to the jury. Respondent's counsel is alleged to have stated to the jury that he had not asked for enough damages, and that damages had just begun.

There is nothing in the record to show that any motion upon the ground stated for a new trial was made to the circuit court. Nor does the court in its order overruling the motion for a new trial make any reference to this matter. The record does not show that any objection was made by appellant's counsel to this alleged statement of respondent's counsel to the jury during the course of the argument. On this issue, the record is silent and it is not properly before us.

Judgment affirmed.

BAKER, C. J., and STUKES, TAYLOR and OXNER, JJ., concur.